Filed 2/25/26  P. v. Patterson CA4/3
Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G061630 |
| v. | (Super. Ct. No. 95HF0300) |
| RAMON PATTERSON, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Scott A. Steiner, Judge. Reversed and remanded with directions.

Jonathan Soglin and Michael Edward Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Daniel J. Hilton and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

*       *       *

In this opinion we reconsider an earlier opinion in which this court affirmed a trial court's denial of a defendant's petition to vacate his murder conviction and to be resentenced. (See Pen. Code, § 1172.6.)[1]

On March 31, 1995, in the early afternoon, 25-year-old defendant Ramon Patterson and his friend Jerome Jones drove to an alley behind an Irvine home. The homeowner, Gregory Hebdon, had purportedly arranged to purchase stolen computers from Patterson, his former employee. It is not entirely clear what happened in the alley. But within a few moments of an apparent kidnapping attempt, Hebdon was shot and killed.

Patterson and Jones were charged with murder, attempted kidnapping, and a felony-murder special circumstance. The first trial resulted in a mistrial as to Patterson. The jury found Jones guilty of first degree murder, not guilty of attempted kidnapping, and did not find true the special circumstance. A second trial of Patterson resulted in another mistrial.

In November 2000, after a third trial, a jury found Patterson guilty of first degree murder and attempted kidnapping. The jury found true the special circumstance allegation. The court imposed a mandatory sentence of life in prison without the possibility of parole (LWOP).

In March 2021, Patterson filed a petition to vacate his first degree murder conviction and to be resentenced. (See § 1172.6.) After reviewing the trial transcripts, the trial court found the People did not prove that Patterson was the actual killer. However, the court denied Patterson's petition because it found him to be a major participant in the underlying

---

[1] Assembly Bill No. 200 (Reg. Sess. 2021-2022) renumbered section 1170.95 as section 1172.6. (See Stats. 2022, ch. 58, § 10.) For clarity, we will generally refer to section 1172.6 throughout. Further undesignated statutory references are to the Penal Code.

felony who acted with reckless indifference to human life.[2] This court affirmed the trial court's ruling on appeal. (*People v. Patterson* (March 22, 2024, G061630) [nonpub. opn.].)

In June 2024, the California Supreme Court granted Patterson's petition for review. The Court later transferred the case back to this court, and ordered us to vacate and reconsider our earlier opinion in light of its ruling in *People v. Emanuel* (2025) 17 Cal.5th 867 (*Emanuel*).

In *Emanuel*, the Court reiterated that a person who did not kill or act with the intent to kill cannot be liable under a first degree felony-murder theory unless there is substantial evidence that the person was a major participant in the underlying felony and "that they '*subjectively appreciated* that their acts *were likely* to result in the taking of innocent life.'" (*Emanuel*, *supra*, 17 Cal.5th at p. 893, italics added.) After conducting a "'fact-intensive'" analysis of a failed daytime robbery, which within moments resulted in the victim's death, the Court did not find substantial evidence to support a finding that the nonkiller defendant acted with the requisite mental state of "reckless indifference to human life." (*Id*. at pp. 883, 896.)

Here, with guidance from *Emanuel*, and after a fact-intensive analysis of a failed daytime kidnapping, which within moments resulted in Hebdon's death, we do not find substantial evidence to support a finding that Patterson *subjectively appreciated* (knew) that his actions would *likely* result in Hebdon's death (i.e., reckless indifference to human life).

Thus, we reverse the order of the trial court denying Patterson's section 1172.6 petition. On remand, the trial court is directed to grant the petition, vacate the murder conviction, and resentence Patterson.

---

[2] The trial court later granted Jones relief under section 1172.6.

3

# I.

## FACTS AND PROCEDURAL BACKGROUND

In 1995, Hebdon and his wife operated a Servpro restoration business in Irvine. The Hebdons also operated another business that involved purchasing large numbers of items at auctions, and then reselling them out of their home's garage.

Rhonda H. (Rhonda) worked as the office manager for Servpro, and was good friends with the Hebdons. Rhonda knew that Hebdon carried a gun with him. Rhonda was also a good friend of Patterson, who lived in Los Angeles. Rhonda introduced Patterson to the Hebdons, who employed Patterson for about a week in January as a temporary Servpro worker. During that time, Patterson asked Rhonda if she knew anybody who might want to buy a computer because, "'I need to get some extra money.'" Rhonda showed Patterson's laptop computer to Hebdon, who agreed to buy it for $950. Rhonda took the cash from Hebdon, wrote a receipt on behalf of the Servpro business, and gave the $950 to Patterson.

Hebdon was interested in buying additional computers from Patterson. Other than the job at Servpro, Rhonda knew Patterson was unemployed. Rhonda became suspicious that the sales "might not be entirely legal." Rhonda told Hebdon, "'You need to contact Ramon. I don't want to be involved anymore as a go-between.'" Thereafter, phone records revealed numerous contacts between Hebdon and Patterson. Rhonda was aware that the Hebdons purchased additional computer equipment from Patterson.

On Friday, March 31, 1995, Patterson called the Servpro office in the morning and asked for Hebdon. Rhonda told Patterson that he was not there; Rhonda then called Hebdon who told her that he had already spoken to Patterson by phone.

On that day, Latasha R. (Latasha) lived with Patterson, who was then driving a Lexus, although he was unemployed. Latasha and Patterson had been dating for about two years, and had lived together for about four months. During the entire time Latasha was dating Patterson, Latasha only saw Jones once at the home of Patterson's aunt and uncle.

At about 7:00 a.m., Latasha woke up when she heard a tap or a knock at the window. Patterson went outside. At about 8:30 a.m., Latasha left for work and Patterson was still home. At about noon, Latasha called the home and spoke to Patterson. Later that afternoon, Latasha was at work when she received a call from Patterson, who "said he had got carjacked, and that was the last time I talked to him."

*The Testimony of Nine Percipient Witnesses*[3]

On March 31, 1995, at about 10:30 a.m., Helen J. (Helen) was with Mrs. Hebdon, who drove to a bank. Helen had been living with the Hebdons as a houseguest. Mrs. Hebdon went into the bank for about 10 minutes, and cashed a check for $3,420.60. Afterwards, they both went to a supermarket to get some groceries. After leaving, they saw a sign for a garage sale, which they briefly stopped at, and then went home. Mrs. Hebdon parked in the alley, and both women took the groceries inside. Helen walked to a nearby mailbox and returned to the home through the alley. At that time, Helen saw that Mrs. Hebdon's car had been moved and Hebdon was now driving his vehicle, a Toyota Land Cruiser, into the alley.

Helen went back inside the Hebdon's home where there were two

---

[3] Ordinarily, we prefer to state the facts in a narrative form. But here we find it necessary to provide a witness-by-witness account due to the varying and sometimes conflicting witness testimony.

men doing some remodeling work. One of the men asked Helen if there was a ladder they could use. Helen went to the alley and spoke to Hebdon, who was now parking the Land Cruiser near the garage. Helen spoke to Hebdon about the ladder, which he then brought into the house. Helen then went to the garage to eat lunch to avoid the noise from the carpenters.

While she was eating lunch, Helen "heard a thump on the garage door and a voice, a male voice say, 'Oh, my god. Somebody please help me.' Then I heard a bang -- or a couple of bangs." Helen testified: "Thinking that it was the carpenters out there, I had no fear. I came out the side door and started to this gate to go outside to check on them. At that point I saw a black male figure running in front of Mr. Hebdon's car and disappear behind it, and then I heard the loud bang, bang, bang, bang, bang, and smelled the gun smoke." Helen said she was looking through the slats of the gate. When she talked to the police, Helen described the Black male she saw from the rear as about five-foot two inches in height and that he had a stocky build. [4]

Helen said she "froze for a few seconds out of fear, and I turned and went in the house to hopefully tell Gregory that I'd heard gunshots in the . . . alley." Helen went back into the home where Mrs. Hebdon was sitting, and she said to her, "'Where's Gregory? I just heard gunshots in the alley.'" Mrs. Hebdon replied, "'Oh, my god, Gregory's in the alley.' And she took off running." Helen followed Mrs. Hebdon into the alley where four or five people were now gathered. Helen saw that Hebdon was under the Land Cruiser and he was shot. Mrs. Hebdon got down underneath the vehicle where she could be with Hebdon. Helen testified that during the entire time that Mrs. Hebdon

---

[4] A physical description of Patterson and/or Jones does not appear to be reflected in the transcripts from the November 2000 trial.

went into the alley until the police arrived, she remained near the Land Cruiser. Helen spoke to a 9-1-1 operator at some point and said that "I didn't see the shooting and I didn't see the handcuffs or the briefcase." [5] Helen told the operator, "'I'm asking people. It's all third hand.'"

At about 12:50 p.m., Edna C. (Edna) was driving a car near the Hebdon home in Irvine. Edna and her passenger Monica A. (Monica) were working as house cleaners. Edna and Monica noticed a sign for a garage sale, and they were trying to find it when Edna looked to her right down an alley. As Edna drove slowly past the alley she saw two dark guys and a White guy between them and she "thought they were playing." Edna said, "I didn't see it well because I was . . . looking for the garage sale."

After driving down the street, Edna made a U-turn, and again drove past the alley. This time Edna stopped and looked to her left because she thought the men in the alley might be involved in the garage sale. Edna estimated five minutes passed between the two times when she looked down the alley. Edna briefly stopped her car and noticed that the three men were standing close to the open trunk of a cream colored car, which was later determined to be a Lexus, about 126 feet away. The Lexus was facing toward the end of the dead-end alley, and its trunk was facing towards Edna.

Edna saw one of the dark men holding up a gun, and the other dark man pushing the White man into the trunk. Edna said that the White man was in between the two dark men, and the dark man holding the gun "was very muscular." Edna said the gun looked "like a machine gun or something with a long barrel." Edna said she honked her horn and drove

---

[5] One of the percipient witnesses testified that he saw a briefcase handcuffed to Hebdon's right wrist.

7

away. Edna said that she had only watched what happened for a few seconds.

As Edna was driving away, she heard gunshots and the sound of screeching tires. Edna then saw the car from the alley now driving on the street, and she watched the car stop at an intersection. Edna said she saw the driver of the car, the man who was holding the gun earlier, get out of the car and close the trunk. Edna then saw the car drive away.

Edna drove back to the alley where a group of people had assembled. Edna saw the White man, later identified as Hebdon, lying near the tire of a Toyota Land Cruiser. Hebdon was "very bloody all over his head" and his wife was crying nearby "and she was in bad shape." Edna later returned to the alley (about 5:00 p.m.) to see what happened to Hebdon. At that point, Edna and Monica stood together and spoke to the police.

At about 12:50 p.m., a next door neighbor of the Hebdons, Lavine H. (Lavine), heard a commotion in the alley and three bangs, similar to fireworks. Lavine looked out her window and saw a light colored car driving out of the alley with its trunk open and bouncing around. Lavine went into the alley and saw that no one else was there.

Lavine saw a foot sticking out from beneath the Hebdon's vehicle and noticed that it was not moving. Hebdon's wife then came running out of their house and screaming her husband's name. Lavine saw Mrs. Hebdon go under the vehicle. Mrs. Hebdon was very upset and told Hebdon, "'Keep breathing, honey. Keep breathing.'" Lavine looked under the vehicle and saw Hebdon lying on his back with a handcuff on his right wrist. Lavine did not see anything else attached to the handcuff. Lavine saw a set of car keys lying on the asphalt. Lavine said that the police arrived within about five minutes.

Lavine said that the police later marked the keys as evidence. [6] Lavine said that she stayed in the alley and spoke to the neighbors until the police took Hebdon's body away about an hour or two later.

At about 12:50 p.m., a neighbor of the Hebdons, Gershon S. (Gershon), was in his backyard when he "heard screams and gunshots." Gershon heard someone scream, "'No, No.'" Gershon did not recognize the voice as Hebdon's, and described it as coming from "a young male." Gershon then heard "kind of a burst of gunshots." Gershon heard "two distinct bursts." Gershon said that he went into his home, called 9-1-1, and then told his family to get down. Gershon said that after about a minute, he left his home and walked through a gate into the alley. Gershon said, "I looked around. It was a very bright day and it was midday, so I didn't see much. It was empty. Only thing I saw is Greg Hebdon's car parked in front -- in front of his garage." Gershon walked closer and saw Hebdon lying underneath his vehicle. Hebdon was lying on his back, with a large pool of blood underneath his head, and he "appeared to me to be [in] a state of shock." Gershon said Hebdon's "right hand had a handcuff attached to it." Gershon did not see anything attached to the other side of the handcuff.

Gershon said that people started coming into the alley. Gershon said that he ran back towards his house to call "9-1-1 again to tell them that somebody was hurt." Gershon said that his wife came out of the house with a phone and he called 9-1-1 again. Gershon said that at this point Mrs. Hebdon came into the alley: "She came out of the house, um, saw Greg under the car, came under the car from the passenger's side. She was screaming. I don't

---

[6] Law enforcement witnesses testified that they did not remember seeing or marking any keys as evidence in the case.

9

remember the exact words, but she was talking to him trying to keep him alive and saying things like, 'They followed me to the bank' or 'from the bank.' I don't remember the exact words."

At this point the police arrived. Gershon said it was about 15 minutes between the time he first entered the alley and when the police arrived. Gershon said the police tried to resuscitate Hebdon. During this time, Gershon noticed a key ring with three or four keys lying on the asphalt in the alley about three to five feet behind Hebdon's Toyota Land Cruiser. Gershon also saw spent shell casings on the ground. Gershon said there were neighbors milling about in the alley discussing what had happened. Gershon overheard a lady who was a houseguest of the Hebdons (Helen), talking to a 9-1-1 operator and mentioning that Hebdon "had a briefcase." The police interviewed Gershon and his wife while they were together at the crime scene. A police officer later testified that Gershon had told her about the key ring, but the officer did not recall seeing the key ring herself.

At about 12:50 p.m., Pamela W. (Pamela), a neighbor of the Hebdons, was in the master bedroom of her home when she heard what she described as two or three "popping noises." Pamela then heard a man yelling, "'Help me, help me. They're going to kill me.'" Pamela looked out her window facing the alley and the first thing she saw was the houseguest of the Hebdons (Helen) standing in front of their garage "in kind of a state of confusion, looking around and whatever."

Pamela saw a Black man crouched down by Hebdon's vehicle. Pamela said the Black man "was crouching a little bit and had his hands in front of him, and then I heard more gunfire." Pamela did not see anything in the man's hands. Pamela then saw the man running from the alley. Pamela said that the man was "well-toned," and had "a large neck." Pamela told the

10

police that the man was wearing a muscle shirt or a tank top.

Pamela said that she then raced downstairs, told her daughter to call 9-1-1, and went outside towards the alley. Pamela said that as she was running down the stairs, she "heard a car['s] tires squealing away." When Pamela got to the alley she saw Hebdon underneath the Land Cruiser, and she then got down on her knees. Pamela testified that she did not remember seeing anyone else near the Land Cruiser at that time.

Pamela said Hebdon was lying on his back, he had blood coming out from his mouth, and he was unresponsive. Pamela saw a handcuff attached to his right wrist, with nothing else attached. Pamela then saw Hebdon's wife, whom she described as "hysterical," come into the alley. Mrs. Hebdon had a portable phone with her and was "screaming '9-1-1.'" Pamela said Mrs. Hebdon "got right down there next to me and she was going, 'Don't die, Greg. Don't die, Greg.'" Pamela said that "very quickly thereafter the police came." Pamela said that when the police arrived she was holding on to Mrs. Hebdon "and trying to console her at that point in time."

A few days later, Irvine police officers showed Pamela a six-pack photo lineup. Pamela selected number three, which was Patterson, stating in writing that the photograph "'most resembles the man I saw because of the close cropped hair and general facial features, also his physique is what I remembered, more muscular and well-toned.'" Of the six Black men in the photo array, Patterson was the only one wearing a muscle shirt or a tank top.

On March 31, 1995, at about 8:30 a.m., Milton K. (Milton) arrived at the Hebdon home to put in a wall unit. Milton parked his van in the alley behind the home. Milton was assisted by Herbert K. (Herbert). Also present in the home were Hebdon, his wife, and their houseguest (Helen). At some point in the morning Hebdon brought Milton a ladder. At some later point,

11

Milton "heard a barrage of fire -- fireworks, firecrackers going off." The noises sounded like they were coming from the alley.

Milton walked outside and "out to the gate and looked through the slats, and I saw a gentlemen crouched in front of [Hebdon's] vehicle trying to look around." Milton said the man was Black, but he was not able to see his face. Milton returned to work, and then heard Helen come in the house screaming and yelling. Mrs. Hebdon then went outside and the person he was working with, Herbert, went into the alley and came back in a scared state. Herbert said there was blood all over and "there was a man underneath the vehicle with a briefcase handcuffed to his arm -- hand."

Herbert testified that while working at the Hebdon residence, at some point he heard what he thought were fireworks. Herbert said Milton when outside to the backyard and came back inside. Herbert heard the houseguest (Helen) yelling and crying, and minutes later he went outside and saw Hebdon underneath a Toyota Land Cruiser. Herbert said he saw blood and saw that Hebdon "had a briefcase handcuffed to his hand." Herbert said the briefcase was dark and had a hard case.

At about 12:50 p.m., Robert K. (Robert), a phone technician was driving on the street perpendicular to the alley behind the Hebdon's home. Robert saw a light colored Lexus driving erratically and "speeding on the wrong side of the alley coming towards me." Robert sped up so the car wouldn't hit him. Robert saw that there were two Black males in the Lexus. Robert saw the driver stop, get out of the car, and close the trunk. As the driver ran back to the car, "the trunk popped back open, so he got back out and slammed it." Robert then saw the car run through a red light.

At about 1:00 p.m., Cheryl B. (Cheryl) was driving in the area of the Hebdons' house. In the lane next to her Cheryl noticed a Lexus in which

the driver and passenger, two young Black males, were removing clothing "while they were driving, while the vehicle was moving." Cheryl later stopped at an intersection and the Lexus was again next to her. Cheryl also noticed the license plate holder was from a car dealership in Torrance. Cheryl saw that the Lexus was driving "a little bit fast," and "somewhat erratic" before it merged onto the northbound 405 freeway.

A few days later, Irvine police showed Cheryl a six-pack photo lineup. Cheryl selected number three, a photo of Patterson, stating: "'The person in photograph number three is the person I saw in the vehicle. I'm not certain whether he was the driver or the passenger.'"[7] About a week later, police showed Cheryl another photo lineup. Cheryl selected number two, a photo of Jones, stating: "Photo number two, I'm not sure whether it was the passenger or the driver."

*Police Investigation*

On March 31, 1995, at about 12:55 p.m., an Irvine patrol officer pulled his vehicle into the alley behind the Hebdon residence in response to a call of shots fired. The officer saw several adults standing in the alley directing him forward. After getting out of his vehicle, the officer noticed a body, later determined to be Hebdon, lying beneath a Toyota Land Cruiser next to a garage. The officer also saw a female's legs, later determined to be Mrs. Hebdon, extending out from beneath the vehicle. Mrs. Hebdon was in a panicked state, crying and yelling at her husband to wake up.

After getting Mrs. Hebdon out of the way, the officer crawled

---

[7] During the trial, Cheryl testified as to Patterson, "I'm pretty sure he was the passenger."

13

underneath the vehicle. Hebdon was lying on his back with a large amount of blood underneath his head, and some coming out of his mouth. The officer could not detect a pulse, so he pulled Hebdon's body out from under the vehicle with the help of another officer, and they both performed CPR. Paramedics soon arrived and asked the police to move Hebdon further away from the garage so they would have more room to work.

As the officer was moving Hebdon, he noticed there were handcuffs attached to Hebdon's right wrist. The officer did not see a briefcase attached to the handcuffs. The officer called for a crime scene investigator (CSI) to photograph and take possession of the handcuffs. The officer used a key to remove the handcuffs and put them into a bag. The officer then went to his car, got some orange traffic cones, and placed them over empty shell casings in the alley, so they would not be disturbed. The officer did not see a set of keys. About 15 minutes after he had arrived in the alley, the officer then left in an ambulance to a nearby hospital with Hebdon.

After photographing the handcuffs at about 1:15 p.m., the CSI secured the scene, took additional photographs, and completed other work for about five hours. When the CSI first arrived on the scene, the rear hatch of Hebdon's Toyota Land Cruiser was up. In the rear portion of the vehicle, visible to anyone walking up to it, was a white envelope; the envelope contained $3,400 in one hundred dollar bills. Leaning on the envelope was a fanny pack containing a .38 caliber revolver. Also inside the back end of the vehicle was a black briefcase that was not booked into evidence and whose contents were not searched or inventoried.

The CSIs did not see any keys lying on the ground. The CSIs photographed and collected several expended nine millimeter cartridge casings. The CSIs photographed tire marks in the alley and fresh damage to

14

a nearby tree. After the Land Cruiser had been moved out of the alley, a CSI took photographs of blood stains and two gouge marks on the asphalt underneath. The gouge marks were consistent with someone fairly low to the ground firing a gun at a low angle.

At about 8:09 p.m., a Los Angeles County deputy was on patrol in Compton. On a street near a park the deputy took notice of a white car because it was a Lexus and "it looked as though it had been parked in a hurried manner. It was kind of offset a little bit from the curb." The deputy approached on foot and saw that a set of car keys clearly visible on the center console, and that the driver's side window was rolled about halfway down. The deputy conducted a license plate check and determined that the Lexus was wanted by Irvine police in connection with a crime.

A CSI arrived and took photographs of the Lexus. The following day, latent prints were identified, that matched Patterson and Jones. Inside of the car officers found Patterson's car rental agreement. A CSI took a carpet sample from the inside of the trunk to check for trace evidence. Hebdon's hairs were found in the trunk. Small blood stains were found on the inside driver's side door area, on the left rear fender, on the trunk near the center exterior, and another in the interior of the trunk. Hebdon was identified as the source of the bloodstains.

In the trunk of the Lexus was found an expended shell casing. Tree sap was found on the rear license plate and the license plate frame. After measuring and comparing the damage to the Lexus and to the tree at the crime scene, Irvine police opined the driver of the Lexus had made a very fast three-point turn in the alley, crashed into the tree, and then sped off.

A forensic pathologist later performed an autopsy on Hebdon, who was shot eight times. The pathologist opined that the weapon was fired

15

from at least three to three and a half feet away. Hebdon had died from massive bleeding due to the multiple gunshot wounds. The pathologist also saw lacerations and abrasions to the back of Hebdon's head that were likely inflicted by a blunt instrument, which could have been a firearm. There was also redness on Hebdon's right wrist consistent with handcuffs.

In May 1995, an Irvine maintenance worker found a gun without a magazine in a storm drain near the Hebdon home. Later testing revealed that the expended cartridges found at the crime scene were fired from the weapon found in the storm drain.

In May 1995, a fugitive apprehension team arrested Jones in Seattle, Washington. The same team later arrested Patterson, who had a valid Washington driver's license with a different name on it.

*Pretrial Proceedings*

In April 1998, the People filed an amended information charging Patterson and Jones with murder and attempted kidnapping. The People alleged a felony-murder special circumstance (a murder committed during the commission of an attempted kidnapping). They further alleged a principal armed with a firearm enhancement, a strike prior as to Patterson (attempted robbery) and Jones (aggravated assault and attempted robbery) and a serious felony (nickel) prior as to both.

In October 1998, after a jury trial had begun, the court granted Patterson's motion for a mistrial. The jury later found Jones guilty of first degree murder, not guilty of attempted kidnapping, and found the special circumstance allegation not true. The court imposed a sentence of 56 years to life. "Patterson's second trial resulted in a mistrial due to a jury deadlock."

16

*Relevant Trial Proceedings*

In November 2000, Patterson's third jury trial began. The People called 25 witnesses and introduced Patterson's prior trial testimony through a reader. Patterson called the two carpenters who were working in the Hebdon home. Patterson again testified on his own behalf. During the second trial and the third trial, Patterson's testimony was largely consistent.

Patterson testified that he grew up in an area between Carson and Compton. Patterson said he met Jones and played sports with him when he was about 10 years old, but they did not remain in contact while growing up. Patterson went to prison in 1990 for a theft-related felony, and he was aware that Jones spent some time in prison. Patterson said that he bumped into Jones in March 1995, and they began hanging out with each other again as they were both unemployed.

Patterson said that as a convicted felon he was unable to find a job and that he made money by selling stolen computers. Patterson said that he was getting the computers from his uncle, who was a supervisor at a warehouse. Patterson would "usually give my uncle anywhere from $450 to $500 for each computer, and everything after that was mine."[8] Patterson said at the time the value of laptop computers was from $4,200 to $4,800, and he was selling them for about $900 to $1,200. Patterson said he did not anticipate violence while selling stolen property, and he did not carry a gun with him, although the "majority of men in my neighborhood do carry guns."

Patterson testified that in January 1995, he met Hebdon and his wife through Rhonda. Patterson worked for a few days with Servpro drivers,

---

[8] Patterson's uncle testified that in March 1995, he worked as an inventory control supervisor at a computer warehouse with shrinkage problems, but he denied that he sold stolen computers to Patterson.

17

and "did what they asked me to do." Patterson liked Hebdon, and talked with him about "maybe trying to come back and get hired permanent later on." Afterwards, Patterson kept in frequent contact with Hebdon who "had expressed that he had liked the computer, the Toshiba that he had bought from me, and he was interested in getting more." Patterson said that "all the computers I got were brand new in the box [and] still had the plastic wrapped around them." Patterson testified that once Hebdon had come up to his primarily Black neighborhood in Los Angeles to purchase some computers in a public park, but Hebdon and his family, who were white, abruptly left.

On March 31, 1995, at about 10:40 a.m., Patterson called the Hebdon's house and spoke to Mrs. Hebdon, and then Hebdon called him back after being paged. Patterson was with Jones at his home when he called. Patterson testified that he had acquired five Toshiba laptops, and he had arranged to sell them to Hebdon for $900 each. Patterson said that Hebdon had told him to come to his home at around lunchtime.

Patterson testified that Jones went with him to Irvine because Jones "was just tagging along basically." Patterson said that before they left Jones put a gun in his waistband, which was not unusual because he did this "[e]very time he leaves the house." Patterson said he did not think anything of it because "the guys in my neighborhood carry guns." Patterson said that when they left he thought Jones may have been high, and he had seen Jones smoke PCP on prior occasions. Patterson said this did not worry him as Jones was not going to be involved in his transaction with Hebdon.

Patterson testified that he had no trouble finding Hebdon's house because he had been there two or three times before while he was working for Servpro to pick up equipment stored in the garage. Hebdon told Patterson to meet him out back, and he parked his car behind Hebdon's vehicle in the

18

alley. Patterson greeted Hebdon, who had a briefcase attached to his hand with a handcuff. Patterson thought this was strange, and he asked Hebdon about it, but Hebdon told him that "it didn't have anything to do with me."

Patterson said that he and Hebdon then went to the back of the Lexus and he opened up the trunk to show Hebdon the computers. Jones stayed in the car. It was then that Hebdon told Patterson he was only willing to pay $700 for each computer, even though the agreed upon price was $900. Patterson said he was upset because he had driven all the way down to Irvine and he told Hebdon, "Hell, no."

Patterson testified that during this loud conversation with Hebdon at the trunk, Jones unexpectedly came up behind Hebdon and hit him over the head. Patterson said he did not see Jones get out of the car, and he did not initially see what happened, but Hebdon then "fell against me." After Hebdon slumped against Patterson, he noticed that Jones was holding his gun in his hand. Patterson said that Hebdon then swung back at Jones with the briefcase. Patterson said he that he heard a shot, and Hebdon then "fell against me again." Patterson said Hebdon "kind of like fell against me and like rolled off of me and ran by me." Patterson testified Hebdon ran toward the front of the Lexus, and Jones ran after him.

Patterson said he was panicked, scared, shocked and "tried to leave." Patterson jumped in the Lexus, and "immediately threw it into reverse and backed up . . . into a tree." Patterson intended to leave Jones behind, but in the "process of backing up and turning around, there was some point in time the car was turned diagonally in the alley, and that's when he ran back and jumped in." Patterson did not hear any additional gunshots prior to Jones getting in the car. Patterson said that "my whole focus at the time when everything was going on, I was trying to get up out of there."

19

Patterson testified that after he "flew out of the alley, that's when I noticed the trunk was up." Patterson stopped, jumped out, and closed the trunk. Patterson said that he later pulled over and Jones got out of the car and threw the gun in a storm drain. Patterson abandoned his car that night in Los Angeles and hid at a friend's house for two weeks. Patterson fled to Seattle where Jones was and he remained there until he was caught.

At the end of the trial during closing argument, the prosecutor acknowledged that some of the evidence pointed to Patterson as the shooter and some of the evidence pointed to Jones. The prosecutor said "it doesn't matter in this case, folks, because both at the very least were aiders and abettors, aiders and abettors to a felony murder kidnapping or aiders and abettors to a premeditated and deliberate murder." The defense argued that the witnesses influenced each other's accounts of what they had witnessed, Patterson's account was consistent with the evidence, and he had no possible motive to harm the Hebdons. (See CALJIC No. 2.51 ["Absence of motive may tend to show the defendant is not guilty"].)

On its first full day of deliberations, the jury asked for "a specific definition as to whether or not we can find Ramon Patterson guilty of 1st degree murder or 2nd degree murder as a principle [*sic*] that aided and abetted. In other words, ca[n] we find Ramon Patterson guilty of 1st or 2nd degree murder as an aider and abettor even though there may be insufficient evidence that shows that Ramon Patterson was the gunman?" The court directed the jury to reread the  felony murder and aiding and abetting instructions. On the second day of deliberations, the jury asked for a complete readback of the housekeeper Edna's trial testimony.

On the third day of deliberations, the jury found Patterson guilty of first degree murder and attempted kidnapping. The jury found true the

20

felony-murder special circumstance. The court found true that Patterson had a strike prior and a serious felony prior. The court imposed an LWOP sentence. The judgment was affirmed on direct appeal. (*People v. Patterson* (May 24, 2002, G028671) [nonpub. opn.].)

*Post-Trial Proceedings*

In March 2021, Patterson filed a petition for vacatur and resentencing. (See § 1172.6.) The trial court later issued an order to show cause and set the matter for an evidentiary hearing.

Prior to the hearing, Patterson filed a brief seeking the admission of Jones's prior bad acts. (See Evid. Code, § 1101, subd. (b).) Patterson sought to admit evidence that five months before Hebdon's death, Jones committed two counts of aggravated murder in Seattle, Washington. The victims were a 23-year-old woman and her three-year-old son. Both victims suffered multiple gunshots, and the young woman suffered blunt force trauma to the head. The case was solved years after it had occurred through DNA testing.

Patterson argued: "This evidence tends to show that in the present case, the shots were by Jerome Jones, and <u>not</u> Ramon Patterson, in the shooting and killing of Gregory Hebdon on March 31, 1995. The evidence shows that on at least two prior occasions, Jerome Jones shot victims in the course of violent felonies. But there is no evidence of record that leading up to the death of Gregory Hebdon, Ramon Patterson had any knowledge of the crimes of Jerome Jones . . . . In the present case, the actions of Jerome Jones were unprovoked, spontaneous, and not predictable by Mr. Patterson.

"Not only does this evidence dramatically increase the existence of reasonable doubt that Patterson was the actual killer, but it also strengthens the case that Patterson has been trying to make since his arrest

21

in 1995 -- namely, that Jones' shooting of Hebdon was a shockingly violent and impulsive killing that Patterson never foresaw, let alone intended. That interpretation of the evidence . . . would have had little bearing on Patterson's liability for murder in 1995. But it is dispositive here, since it creates (to say the least) reasonable doubt that Patterson acted with reckless indifference to human life in connection with the murder of Hebdon — i.e., the only way his murder conviction could be sustained in 2022 given the reasonable doubt on the issue of who shot Hebdon."

On July 15, 2022, the trial court conducted the evidentiary hearing. The People stipulated to the admission of the prior bad act evidence. At the conclusion of the hearing, and after "having considered all the evidence in the case," the court found the People did not prove Patterson was the actual killer. However, the court denied Patterson's petition because it found him to be a major participant in the underlying felony who acted with reckless indifference to human life.[9] This court affirmed the court's ruling on appeal. (*People v. Patterson* (March 22, 2024, G061630) [nonpub. opn.].)

In June 2024, the Supreme Court granted a petition for review, and later transferred the case with directions for us to vacate our prior opinion and reconsider the cause in light of *Emanuel, supra,* 17 Cal.5th 867.

II.

DISCUSSION

Patterson contends that in light of the Supreme Court's ruling in *Emanuel, supra,* 17 Cal.5th 867, substantial evidence does not support the trial court's conclusion that during the course of the attempted kidnapping he

---

[9] The trial court later granted Jones's section 1172.6 petition.

22

acted in reckless disregard for human life. We agree.

We accept the trial court's findings to the extent they are supported by substantial evidence. (*People v. Breslin* (2012) 205 Cal.App.4th 1409, 1415–1416.) "'"Substantial evidence" means that evidence which, when viewed in light of the entire record, is of solid probative value, maintains its credibility and inspires confidence that the ultimate fact it addresses has been justly determined.'" (*People v. Lehman* (2016) 247 Cal.App.4th 795, 804.)

In this discussion we will: A) consider the former and current felony-murder rule; B) discuss the Supreme Court's ruling in *Emanuel*; and C) analyze the Court's ruling as it applies to the facts in this case.

*A. The Felony-Murder Rule*

"Except for strict liability offenses, every crime has two components: (1) an act or omission, sometimes called the actus reus; and (2) a necessary mental state, sometimes called the mens rea." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (§ 188, subd. (a)(1).) "Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(2).)

As to murder, the actus reus is the perpetrator's act causing death, and the mens rea is malice aforethought. (§ 187, subd. (a).) "In California, the felony-murder rule provides an exception to the malice requirement for murder." (*People v. Vang* (2022) 82 Cal.App.5th 64, 81.) Under the former felony-murder rule, every person who participated in an

23

underlying felony could be liable for murder, regardless of whether the killing was accidental, and regardless of the participant's mental state. (*Ibid.*)

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437, which amended sections 188 and 189. (Stats. 2018, ch. 1015, §1, subd. (f).) The legislation effectively eliminated the natural and probable consequences doctrine as it relates to murder, and narrowed the scope of the felony-murder rule. The legislation also created a procedure by which a defendant previously convicted of murder under either of those former theories could file a petition for resentencing. (§ 1172.6.)

The Legislature's current version of the felony-murder rule now provides: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. (2) The person was not the actual killer, but, with the intent to kill, aided, [¶] abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life . . . ." (§ 189, subd. (e).)

In this case, we are concerned with the third provision of the current felony-murder rule, which states both the actus reus and mens rea for a nonkiller defendant without the intent to kill. The required act is being a "major participant in the underlying felony," and the required mental state is a "reckless indifference to human life." (§ 189, subd. (e)(3).)

The major participant/reckless indifference language of the current felony-murder rule was imported from the Penal Code section that lists the most severe types of murders with special circumstances that are punishable by the death penalty or LWOP (torture murders, murders for

24

hire, murders against law enforcement, etc.). (See § 190.2.)

Ordinarily, the United States Supreme Court has held that the prohibition against cruel and unusual punishments requires a defendant to have either an express or implied intent to kill in order for the death penalty to apply. (*Enmund v. Florida* (1982) 458 U.S. 782, 797 (*Enmund*) [wheelman who did not participate in killing during armed robbery could not receive the death penalty].) But as an exception, the Court held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." (*Tison v. Arizona* (1987) 481 U.S. 137, 158 (*Tison*).) In *Tison*, the defendants broke two inmates out of prison, armed the escaped prisoners, captured and then held a family of passing motorists at gunpoint for a prolonged period of time while the escapees deliberated whether to kill them, and then abandoned the victims in a remote desert after the escapees shot them. (*Id*. at pp. 139–141.) The Court held the "facts not only indicate that the Tison brothers' participation in the crime was anything but minor; they also would clearly support a finding that they both subjectively appreciated that their acts were *likely* to result in the taking of innocent life." (*Id*. at p. 152, italics added.)

In *People v. Banks* (2015) 61 Cal.4th 788, the California Supreme Court later identified a nonexclusive list of factors that are relevant in deciding whether a person was a *major participant* under the felony-murder special circumstance. The *major participant* factors identified in *Banks* "are these: What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at

the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.) The Court stated, "No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.'" (*Ibid.*)

In *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), the Court identified a nonexclusive list of factors that are relevant in deciding whether a person acted with reckless indifference to human life: the defendant's knowledge, and the use and number of weapons; the defendant's proximity to the crime and opportunity to stop the killing or aid the victim; the duration of the conduct, that is, "whether a murder came at the end of a prolonged period of restraint of the victims by defendant"; the defendant's awareness his or her confederate was *likely* to kill; and the defendant's efforts to minimize the possibility of violence during the crime. (*Id.* at pp. 618–623.)

*B. The California Supreme Court's Recent Ruling*

In *Emanuel*, the murder victim (Sonenberg) had arranged to sell a pound of marijuana to defendant Emanuel, and his codefendant Whitley. (*Emanuel, supra,* 17 Cal.5th at pp. 874–875.) Sonenberg arranged to meet Emanuel near a public park, in the middle of the afternoon, in order to complete the deal. (*Id.* at p. 876.) Based on the available evidence, it appears Sonenberg was inside of his truck, with the ignition on, when Whitley and Emanuel approached the truck on a residential street. Whitley pulled a handgun on Sonenberg, hit him with the gun, pointed it at Sonenberg's leg,

26

and demanded the marijuana. Sonenberg refused to give up the marijuana, so Emanuel said "'let's go'" and started to leave. (*Id*. at p. 891.) Sonenberg then tried to push Whitley's handgun away from him. Whitley's handgun fired once, striking Sonenberg in the neck. (*Id*. at pp. 895–896.) Sonenberg's truck then lurched backward with enough force to throw him out of the passenger door. (*Id*. at p. 877.) First responders arrived at the scene. Sonenberg was found lying against a curb; however, he "died at the scene from a 'close-range' gunshot wound to the right side of his neck that perforated his carotid artery." (*Ibid*.)

In 2015, a jury found Emanuel guilty of first degree felony murder. (*Emanuel*, *supra*, 17 Cal.5th at p. 879.) At that time, a defendant could be found guilty of murder if he "committed or attempted to commit an inherently dangerous felony, such as robbery, and an accomplice killed someone during the commission of the felony." (*Ibid*.) Following the Legislature's narrowing of the scope of the felony-murder rule, Emanuel filed a petition for resentencing. (*Id*. at pp. 879–880.) The trial court issued an order to show cause, and after an evidentiary hearing in which the court reviewed the 2015 trial transcripts, the court denied the petition. The court determined "that Emanuel was a major participant in the robbery who acted with reckless indifference to human life." (*Id*. at p. 881.)

However, after analyzing the "reckless indifference" standard, the Supreme Court disagreed with the ruling of the trial court and remanded for resentencing. (*Emanuel, supra,* 17 Cal.5th at p. 881.)

Quoting from some of its earlier rulings, the Supreme Court reiterated "that reckless indifference encompasses both subjective and objective elements. [Citation.] 'As to the subjective element, "[t]he defendant must be aware of and willingly involved in the violent manner in which the

particular offense is committed," and he or she must consciously disregard "the significant risk of death his or her actions create.'" [Citations.] 'As to the objective element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."''' (*Emanuel, supra,* 17 Cal.5th at p. 884.)

"'"The degree of risk to human life is crucial to the analysis.' [Citation.] As the United States Supreme Court has acknowledged, "'the possibility of bloodshed is inherent in the commission of any violent felony,'" such that one who perpetrates or attempts to perpetrate such a crime may well anticipate 'the use of lethal force as a *possibility*.' [Citations.] Were that degree of culpability sufficient, however, it would amount to "'little more than a restatement'" of the former felony-murder rule that [the Legislature] retired. [Citations.] "'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient" to establish reckless indifference to human life; "only knowingly creating a 'grave risk of death'" satisfies the statutory requirement.'" (*Emanuel*, *supra*, 17 Cal. 5th at p. 884.)

"This Court has thus made clear that participation in a "'garden-variety armed robbery,'" i.e., one in which the only factor supporting a reckless indifference finding is that a participant was armed with a gun, is insufficient without more to establish reckless indifference. [Citations] [. . . although any person who plans or participates in an armed robbery can be said to anticipate that lethal force might be used, only about 1 in 200 armed robberies result in death] . . . ." (*Emanuel, supra,* 17 Cal.5th at p. 884.)

The California Supreme Court stated that courts must conduct a "'fact-intensive, individualized inquiry' into where a defendant's conduct falls

on the spectrum of culpability" between *Enmund* (the wheelman who merely participated in the underlying felony) and *Tison* (the defendants who armed escaped convicts and whose actions over a prolonged period demonstrated that they knew that the escapees were likely to kill). (*Emanuel*, *supra*, 17 Cal.5th at pp. 882–883.) In *Emanuel*, the Court analyzed the facts and ultimately determined that "the evidence shows Emanuel set out to commit a robbery in a public place in the middle of the afternoon. He was not armed, and the trial court found he did not know Whitley was armed or *likely* to use lethal force." (*Id.* at pp. 895–896, italics added.)

*C. Application and Analysis*

In *Emanuel*, there was no dispute that Emanuel was a major participant in the underlying felony (attempted robbery). However, after conducting its "'fact-intensive, individualized inquiry'" into the relevant factors, including the totality of the circumstances, the Court determined that there was insufficient evidence of Emanuel's required mental state: reckless indifference to human life. (*Emanuel*, *supra*, 17 Cal.5th at pp. 883, 885–896.)

In this case, as in *Emanuel*, we find there is no real dispute that Patterson was a major participant in the underlying felony (attempted kidnapping). Thus, in compliance with the Supreme Court's order to reconsider our earlier opinion, we will now look at the relevant *Clark* factors as discussed in *Emanuel* in order to determine if there is substantial evidence of Patterson's alleged mental state: reckless indifference to human life.

*1. Use or Awareness of the Presence of Weapons <u>and</u> Knowledge of Cohort's Likelihood of Killing*

As to this *Clark* factor, the California Supreme Court noted that

29

"Emanuel did not use a gun or other weapon during the robbery. The only gun was used by Whitley. The trial court expressly found 'there was no evidence in the record demonstrating that, prior to the robbery, Emanuel knew Whitley possessed a gun, would bring that gun to the robbery, or "was *likely* to use lethal force."'" (*Emanuel, supra,* 17 Cal.5th at p. 885, italics added.) Based on this, the Supreme Court concluded that this factor did "not weigh in favor of a finding of reckless indifference." (*Ibid.*)

Here, the trial court expressly found that the People did not prove Patterson used a gun during the underlying crime. There was evidence that Patterson was aware that Jones had brought a gun to Hebson's home. But this fact is not in and of itself dispositive. (See *In re Ramirez* (2019) 32 Cal.App.5th 384, 403 [finding that a codefendant's awareness that his cohorts were carrying guns during a robbery was insufficient to establish reckless indifference]; see also *Emanuel, supra,* 17 Cal.5th at p. 884 ["although any person who plans or participates in an armed robbery can be said to anticipate that lethal force might be used, only about 1 in 200 armed robberies result in death"].) There is also no evidence that Patterson instructed Jones "to use lethal force." (See *Clark, supra,* 63 Cal.4th at p. 619.)

The Supreme Court's analysis in *Emanuel* teaches us that the first *Clark* element largely turns on whether or not the evidence shows that Patterson was *subjectively aware* (knew) that on March 31, 1995, Jones was *likely* to kill Hebdon during the course of the underlying felony. (See *Emanuel, supra,* 17 Cal.5th at p. 885.) Here, the evidence tends to show that under the circumstances, Patterson did not have such knowledge.

The relevant circumstances include that the crime happened in the middle of the day, in broad daylight, which was similar to what occurred in *Emanuel.* Although the crime did not occur on a public street, it appears as

though the alley behind the Hebdon home was not secluded. Indeed, it appears the alley was routinely used to access the Hebdon home, as demonstrated by testimony that the alley was used by Hebdon's wife to bring in the groceries from her car into the home. Also, there was testimony that equipment used for the Servpro business was stored in the garage adjacent to the alley, and then accessed by Servpro employees. The Hebdon's also operated a side business of conducting sales out of the garage that faced towards the alley. The alley also appears to have been readily visible from the street, and it was also easily accessible to the neighbors. There was also testimony that Patterson was familiar with the non-secluded nature of the alley, given that he had been to the alley on prior occasions, due to his temporary employment in Hebdon's Servpro business.

Patterson's prior employment with Servpro also tends to show that he did not anticipate that it was *likely* that Jones was going to kill Hebdon in the alley on March 31, 1995. That is, Patterson presumably knew that his prior employment records, along with his numerous contacts with the Hebdons would have identified him. Patterson was also introduced to the Hebdons through Rhonda, who was friends with both Patterson and the Hebdons. But despite all of this, on March 31, 1995, Patterson took no steps to conceal his identity, Jones's identity, or the identity of his somewhat conspicuous rented Lexus, prior to his agreed upon sale of the stolen computers to Hebdon at his home in the middle of the day, at a time that Patterson was likely aware that Hebdon's wife would have been there.

The evidence also showed that when Patterson arrived behind Hebdon's house, he parked his rented Lexus into the alley facing a dead end and away from the street. And to get out of the alley, Patterson had to turn the car around by completing a three-way turn. Patterson was apparently in

31

such a panic after the shooting that he screeched the tires and hit a tree on his way out. He also left in such a rush that he left the trunk open. In addition, $3,400 in cash and a firearm were left in Hebdon's open vehicle. Patterson's manner of parking and exiting supports a conclusion that he had no subjective appreciation before the shooting that gunfire was anticipated to break out, or that Jones would have been likely to kill Hebdon.

The Attorney General argues that Patterson's knowledge of Jones's weapon, Jones's possible drug use, and his criminal record establish that Patterson "'knowingly created a highly volatile situation.'" But knowingly creating a highly volatile situation was the threshold under the former felony-murder rule, and it is not the threshold for liability under the reckless indifference provision of the current felony-murder rule. (See *Emanuel, supra,* 17 Cal.5th at p. 884 ["""Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient" to establish reckless indifference to human life; "only knowingly creating a 'grave risk of death'" satisfies the statutory requirement'"].)

Although a reasonable law-abiding person may have thought otherwise (an objective standard), we find there is not sufficient evidence that Patterson was *subjectively aware* that his actions were creating a *high likelihood* of Hebdon's death. (See *Emanuel, supra,* 17 Cal.5th at p. 884 ["reckless indifference encompasses both subjective and objective elements"].)

### 2. Duration of the Crime

In *Clark*, the California Supreme Court explained that "[w]here a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark,*

*supra*, 63 Cal.4th at p. 620.)

In *Emanuel*, the Court noted "that the duration of the contact between Sonenberg, Whitley and Emanuel was 'likely not more than 12 minutes,' and the duration of the violent contact between Sonenberg and Whitley was 'presumably even less than that.'" (*Emanuel*, *supra*, 17 Cal.5th at p. 886.) "[T]he available evidence, including forensic evidence, reflects that Whitley shot Sonenberg during a brief struggle. There *was no prolonged period of restraint*, and the interaction appears to have been nonviolent until Sonenberg refused to relinquish the marijuana without payment." (*Ibid.*, italics added.) The Court concluded: "The *Clark* factor concerning duration of the crime therefore is neutral in this case; it did nothing to heighten the risk of violence beyond that inherent in the robbery itself." (*Ibid.*)

Here, considering the testimony of the percipient witnesses, it appears the duration of the contact between Hebdon, Jones, and Patterson was similarly not more than about 12 minutes, and the duration of the violent contact was considerably less than that. Similar to the Supreme Court's analysis in *Emanuel*, we conclude: "The *Clark* factor concerning duration of the crime therefore is neutral in this case; it did nothing to heighten the risk of violence beyond that inherent in the [attempted kidnapping] itself." (See *Emanuel*, *supra*, 17 Cal.5th at p. 886.)

*3. Efforts Taken to Minimize the Risk of Violence*

In *Emanuel*, the Court noted that this factor concerns facts "relevant to the minimization of risk during the planning stage" of the underlying felony. (*Emanuel*, *supra*, 17 Cal.5th at pp. 887–888.) The Court concluded that the planned robbery in *Emanuel* occurred under circumstances that had the potential for minimizing violence. "Emanuel

planned to participate in a robbery in a public location during daylight hours. The crime occurred in the open where witnesses might be present to observe from the park, passing vehicles, or nearby residences. This factor therefore does not support a finding of reckless indifference." (*Id.* at p. 887.)

In our earlier opinion in this matter we stated that "the record is void of any evidence of planning activity. There was evidence Patterson sold Hebdon stolen computers in the past and arranged to do it again. The record includes no evidence Patterson and Jones *planned* to kidnap Hebdon. In fact, the circumstances of the meeting belie the claim they planned to kidnap him." (*People v. Patterson* (Mar. 22, 2024, G061630) [nonpub. opn.], review granted and prior opn. vacated.)

Here, to the extent that Patterson may have engaged in any planning of a crime beyond the selling of stolen property, the facts are similar to those in *Emanuel*. That is, the encounter occurred in essentially public location during daylight hours, and it was visible to passersby and the Hebdons' neighbors. (See *Emanuel*, *supra*, 17 Cal.5th at p. 887 ["This factor therefore does not support a finding of reckless indifference"].)

*4. Physical Presence at the Scene and Opportunity to Restrain Confederates or Aid Victims*

In *Emanuel*, the Court noted that during the robbery, "Emanuel attempted to act as a restraining influence. In fact, the trial court appears to have accepted that he . . . advocated that he and Whitley leave. [Citation.] In addition to saying 'let's go,' Emanuel began walking away from the robbery. This provides crucial insight into Emanuel's state of mind. When met with resistance, Emanuel abandoned the plan rather than resort to greater violence." (*Emanuel*, *supra*, 17 Cal.5th at p. 891.)

34

"We do not suggest that a rapidly unfolding crime may never allow for a finding of reckless indifference to human life. But where a crime unfolds quickly, this factor — the failure to restrain a cohort — cannot be said to weigh in favor of a finding of reckless indifference without some evidence in the record indicating that the defendant had a meaningful opportunity to do so." (*Emanuel*, *supra*, 17 Cal.5th at p. 892.) There must be evidence to support a conclusion that the defendant had "some awareness of the risk of impending lethal violence and time to react." (*Ibid.*)

Similar to the circumstances in *Emanuel*, the crime in this case was rapidly unfolding. There was some evidence that Patterson may have been the person who screamed to Jones after the first few shots were fired, "'No, No.'" But that evidence was inconclusive. In short, it does not appear in light of the quickly evolving events that Patterson had a meaningful opportunity to restrain Jones. (See *Emanuel*, *supra*, 17 Cal.5th at p. 892 ["this factor — the failure to restrain a cohort — cannot be said to weigh in favor of a finding of reckless indifference without some evidence in the record indicating that the defendant had a meaningful opportunity to do so"].) Thus, this factor does not support a finding of reckless indifference.

### 5. *Totality of the Circumstances*

"The 'totality of the circumstances' must be analyzed to determine whether the defendant acted with reckless indifference." (*Emanuel*, *supra*, 17 Cal.5th at p. 885 ["'"[N]o one of [the *Clark* factors] is necessary, nor is any one of them necessarily sufficient"'"].)

"In sum, the evidence shows Emanuel set out to commit a robbery in a public place in the middle of the afternoon. He was not armed, and the trial court found he did not know Whitley was armed or likely to use

lethal force. Accordingly, there was nothing in the plan that 'elevated the risk to human life beyond those risks inherent in any armed robbery,' much less a planned unarmed robbery. [Citation.] The crime unfolded without a prolonged period of restraint. When met with unexpected resistance, Emanuel told Whitley, 'let's go,' and began to walk away. This tends to show that Emanuel was unwilling to engage in further violence to accomplish the aims of the robbery. Whitley, on the other hand, pulled out a gun, hit Sonenberg with it, and fatally shot him in the neck." (*Emanuel, supra*, 17 Cal.5th at pp. 895–896.)

In sum, the evidence here tends to show that Patterson set out to commit the crime of selling stolen computers to Hebdon, a man who knew Patterson fairly well, in a relatively public place in the middle of the day. Patterson knew that his friend Jones, the person who accompanied him, was armed and may have been on drugs. But it does not appear from all the surrounding circumstances that Patterson subjectively knew that Hebdon was likely to be killed. These circumstances include that the crime of attempted kidnapping unfolded without a prolonged period of restraint. And when met with unexpected resistance, Patterson made a panicked getaway and did not take the $3,400 in cash that was in Hebdon's vehicle. [10]

"Toward one end of the spectrum was the getaway driver the high court found constitutionally ineligible for death in *Enmund* [, *supra*,] 458 U.S. [at pp.] 797–801: a '"minor actor in an armed robbery, not on the scene,

---

[10] Patterson raises the issue of his youth at the time of the offense. We decline Patterson's "invitation to discuss the significance of his youth for the first time here, given our conclusion that the evidence is otherwise insufficient to support a finding of reckless indifference to human life." (See *Emanuel, supra,* 17 Cal.5th at p. 885, fn. 6.)

who neither intended to kill nor was found to have had any culpable mental state.'" [Citation.] Toward the other end of the spectrum were the confederates . . . in *Tison, supra,* 481 U.S. 137, who had broken convicted murderers out of jail, armed them, captured an innocent family, 'held [the family] at gunpoint while the two murderers deliberated whether the family should live or die, [and] then stood by while all four members were shot.'" *(People v. Strong* (2022) 13 Cal.5th 698, 705.)

Here, based on our fact-intensive analysis, and with the Supreme Court's guidance *Emanuel,* we conclude Patterson's conduct placed him more towards the *Enmund* end of the spectrum. In short, there is an absence of evidence that Patterson *knew* his conduct would *likely* result in Hebdon's death. Thus, we find insufficient evidence to support the trial court's finding that Patterson acted with reckless indifference to human life.

## III.

## DISPOSITION

The trial court's order denying Patterson's section 1172.6 petition is reversed. On remand, the trial court is directed to grant the petition, vacate the murder conviction, and resentence Patterson. [11]


MOORE, ACTING P. J.

WE CONCUR:


GOODING, J.


BANCROFT, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

---

[11] This is the same disposition that occurred in *Emanuel*. (See *Emanuel, supra,* 17 Cal.5th at p. 896.) At oral argument, the Attorney General took the position that if this court were to reverse, then the matter should go back for another evidentiary hearing. But we have found no authority in support of that disposition. Further, we do not believe that such a disposition would be in the interests of justice. (See § 1260 [an appellate court may "remand the cause to the trial court for such further proceedings as may be just under the circumstances"].)